## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| WILLIAM THOMAS KNOTTS, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civil Action No.  2:01cv518-A |
| | ) | (WO) |
| DONAL CAMPBELL, | ) | |
| | ) | |
| Commissioner of the Alabama | ) | |
| Department of Corrections, et al., | ) | |
| | ) | |
| Respondents. | ) | |

## MEMORANDUM OPINION AND ORDER

## I. INTRODUCTION

On April 27, 2001, the Petitioner, William Thomas Knotts ("Knotts"), an Alabama inmate formerly under sentence of death, filed a petition in this court for writ of habeas corpus under 28 U.S.C. §2254.  In the answer, the Respondents ("the State") asserted that many of the claims raised are precluded from review in this court because the claims are barred by procedural defaults.  On June 25, 2001, this court entered an order directing that this case should proceed in two stages, the first of which would be to determine which claims should be dismissed on procedural default grounds and which non-defaulted claims require an evidentiary hearing, and the second of which would be to determine the merits of the non-defaulted claims.  The determination of stage one issues was referred to Magistrate Judge Vanzetta Penn McPherson for a recommendation.  The court subsequently adopted the Recommendation of the Magistrate Judge.

After this court had resolved the procedural issues raised in this case, the Supreme Court of the United States held that the "Eighth and Fourteenth Amendments forbid imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed." See Roper v. Simmons, _ U.S. _, 125 S.Ct. 1183, 1200 (2005).

At the request of the court, Knotts and the State filed their respective positions on the effect of Roper in this case. The parties were in agreement that if the Petitioner was under the age of 18 at the time the crime at issue was committed, the court "should find that [Petitioner] is entitled to penalty phase relief, under Roper." State's Position (Doc. # 143) at page 2. The court received credible proof from Knotts, in the form of a certified copy of his birth certificate, that he was under 18 at the time the crime was committed and ordered that the Petitioner be resentenced or habeas relief would be granted. Knotts subsequently has been resentenced to life in prison without possibility of parole. Accordingly, because his sentencing phase claims have been rendered moot, LeCroy v. Sec'y, Fla. Dep't of Corr., 421 F.3d 1237, 1240 (11th Cir. 2005), the court will only address in this Memorandum Opinion and Order the guilt- innocence phase claims asserted by the Petitioner.

For reasons to be discussed, the remaining claims in the Petition are due to be DENIED.

## II.  FACTS AND PROCEDURAL HISTORY

In October of 1989, Knotts, who was seventeen at the time, was in the custody of the Department of Youth Services, having been adjudicated a delinquent. According to the facts found by the Alabama Court of Criminal Appeals during Knotts's direct appeal, Knotts escaped from the facility in which he was being held. In a statement given to police and admitted into evidence at his criminal trial, Knotts said that a woman drove by Knotts and another individual

who had escaped from the facility, named Michael Claburn ("Claburn"), splashed water on them, causing Claburn to fall off a bridge, and yelled race-based names at them. Vol. XVII, Tab 18, pages 40, 41.  The two juveniles turned themselves in and were returned to the detention facility. Id. at 41.

Knotts again escaped from the detention facility.  He broke into the house of Carrie Ware and stole various items including a 22 caliber gun.  Id. at 47.  He then broke into the home of Sheila Rhodes and stole various items including firearms.  Id. at page 49. He then went to the home of the woman with whom he and Claburn had had a previous altercation, Helen Rhodes, and waited for her to return home. Id. at page 57.  He shot Helen Rhodes once in the arm and once in the back while her young child was in the home.  Id. at page 59.  He fled the house in Helen Rhodes's car and was arrested.

Part of a taped statement given by Knotts in response to questioning by Investigator Bryan included the following exchange:

> Answer:  I shot first at the window I didn't shot (sic) I was trying to shoot at her, I didn't know what I was shooting at you know I was just shooting the gun.
> Bryan: But was you, did you mean to shoot at her?
> Answer: Yes sir.
> Bryan: So you meant to sh, you stay there (sic) and you meant to shoot her? Why did, why did you shoot her the second time? Did you mean to kill her?
> Answer: (no response)
> Bryan: Then you, but you shot twice.
> Answer: It was more an impulse, man.
> Bryan: That what I need to know.
> Answer: I shot her.
> Bryan: I understand. And you shot her because? Why did you shoot her?
> Answer: I don't think I shot her for that reason at all.
> Bryan: But you were there earlier and that's what you went in there (sic).
> Answer: That was what I was there for the first part.
> Bryan: Okay.
> Answer:  But I don't think I shot her for that that reason.  I think that I shot her because I panicked.  Cause the gun was cocked back and . . . .  was ready to shot

3

(sic).  And I had my finger on the trigger.  And when I pulled that trigger the first shot went past her.  Whether it hit her I don't know or went through her or what I don't know and it hit the window.

Id. at page 62.

Six delinquency petitions were filed in Montgomery County Juvenile Court against Knotts, including a petition for the capital murder of Helen Rhodes.  In November of 1989, he was transferred to circuit court to stand trial as an adult. The transfer was reversed, and the case remanded for a new transfer hearing.  Ex parte W.T.K., 586 So. 2d 850 (Ala. 1991).  The new transfer hearing resulted in Knotts again being transferred to circuit court.  Knotts was also indicted and charged in state circuit court with two counts of capital murder for the death of Helen Rhodes.  Separate indictments charged Knotts with escape, two counts of burglary, and three counts of theft.

On July 25, 1992, Knotts was tried and convicted of the capital murder of Helen Rhodes, and convicted of escape, burglary and theft.  On October 10, 1992, the trial court sentenced him to death for the murder of Helen Rhodes.  Knotts was also sentenced for escape, burglary and theft convictions.  The sentences for the burglary and theft convictions were reversed, and the Petitioner was re-sentenced.  The conviction and sentences were then affirmed by the Alabama Court of Criminal Appeals and the Alabama Supreme Court denied certiorari.  See Knotts v. State, 686 So. 2d 484 (Ala. Crim. App. 1995), aff'd, 686 So. 2d 486 (Ala. 1996), cert. denied, 520 U.S. 1199 (1997).

In October 1997, Knotts filed a collateral challenge to his conviction and death sentence in state court pursuant to Rule 32 of the Alabama Rules of Criminal Procedure.  Following evidentiary hearings, the state circuit court denied post-conviction relief.  On January 30, 1998,

Knotts petitioned the Alabama Court of Criminal Appeals for a writ of mandamus on the issue of Knotts's request that Judge Price recuse himself because of judicial bias.  The petition was denied.  Ex parte Knotts, 716 So. 2d 262 (Ala. Crim. App. 1998).   Knotts's post-conviction relief was denied, the Alabama Court of Criminal Appeals affirmed the denial of post-conviction relief, and the Alabama Supreme Court denied Knotts's petition for writ of certiorari on October 13, 2000.

### III. HABEAS CORPUS STANDARD

A district court must resolve all claims for relief  raised in a petition for writ of habeas corpus whether habeas relief is granted or denied.  Clisby v. Jones, 960 F.2d 925, 936 (11th Cir. 1992), cert. denied, 513 U.S. 1162 (1995).  A claim for relief is deemed to be any allegation of a constitutional violation. Id.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs this court's review in this case.  Under the AEDPA,

(d) An application for writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

(e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

5

28 U.S.C. § 2254.

The United States Supreme Court has interpreted the provisions regarding a state court decision that is "contrary to" or an "unreasonable application of" clearly established federal law. See Williams v. Taylor, 529 U.S. 362 (2000). In Williams, the Court determined that under the "contrary to" clause, a federal habeas court may grant a writ of habeas corpus if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. Id. at 405. A state court decision is contrary to clearly established Supreme Court precedent if the state court applies a rule that contradicts the governing law set forth in Supreme Court precedent. Id.; see also McIntyre v. Williams, 216 F.3d 1254 (11th Cir. 2000). Under this standard, an unreasonable application is an objectively unreasonable application of the federal law set forth in decisions of the United States Supreme Court. McIntyre, 216 F.3d 1257.

## IV.  DISCUSSION

Knotts has briefed various guilt-innocence phase claims not based on ineffective assistance of counsel separately from guilt-innocence phase claims based on ineffective assistance of counsel. Accordingly, the court will address each of the guilt- innocence phase claims which are not based on ineffective assistance of counsel in the order in which Knotts has asserted them, and then will turn to the ineffectiveness of counsel claims in the guilt- innocence phase claims in the order in which they are asserted by Knotts.

I.  Guilt-Innocence Phase Claims Which are Separate from Ineffective Assistance of Counsel Claims

A.  Claim that the Prosecutor Engaged in Outrageous Misconduct During the Guilt-Innocence Phase of the Trial

Knotts has pointed to several different aspects of prosecutorial conduct which he contends entitle him to habeas corpus relief in this matter.

Prosecutorial misconduct which undermines the fairness and integrity of a trial can be so prejudicial to the accused that it rises to the level of a constitutional violation. See Darden v. Wainwright, 477 U.S. 168, 181 (1986).   In determining whether misconduct rises to the level of a constitutional violation, a reviewing court must decide whether there is a reasonable probability that, had the remarks not been made, the outcome would have been different.  Brooks v. Kemp, 762 F.2d 1383, 1402 (11th Cir. 1985).  "Of primary importance is the need to examine the entire context of the judicial proceeding." Romine v. Head, 253 F.3d 1349, 1369 (11th Cir. 2001)(citation omitted).

The court will first examine the evidence of alleged misconduct and then will analyze whether the conduct was improper and whether, had it not occurred, the outcome would have been different.

Knotts first points to a statement by the prosecutor, Ellen Brooks, in her closing argument at trial that Knotts attempted to kill Helen Rhodes's young son.  Knotts argues both that there was a constitutional violation by the implication that he attempted to commit a crime not charged in the indictment, and that there was a danger that the jury would convict him on that basis, rather than on the evidence of the crime charged at trial.[1]  Knotts points to statements in the

---

[1]  Although the conduct was uncharged, there is evidence in the record that Knotts's counsel anticipated that this argument might be made.  During the Rule 32 proceedings, Richard Lawrence testified that at some point during the trial he knew that the prosecution had the belief that Knotts had shot at the boy. Vol. XLIV, Tab 1, page 264.

closing argument of the prosecutor in which she said that Knotts fired at the child and missed him.

One portion of the prosecutor's closing argument, including objections by Knotts's counsel Richard Lawrence ("Lawrence") consisted of the following:

> I submit to you that the defendant left behind another piece of evidence that he didn't tell you about in his video taped statement.  I submit to you that what happened was after he killed Helen Rhodes, the child was there hollering. He's yelling be quiet. He pulls the trigger of the Smith & Wesson, because the derringer is empty–
>
> Mr. Lawrence: Your Honor I–there's no evidence to infer that.
>
> The Court:  Inferences can be drawn from the evidence. Overruled.
>
> Ms. Brooks:  He fires at the kid and, thank God, misses him.
>
> Mr. Lawrence: Your Honor, there's no evidence to that regard.
>
> The Court: The jury will remember what the evidence is, and I'll tell the jury this is just argument and they can draw any inferences they care to draw from the facts proven.
>
> Ms. Brooks: Look at the pictures of where this bullet came out of the wall. It's not up at four feet, five feet, six feet height.  It's practically on the ground.
>
> Mr. Lawrence: Your honor, he's not charged with any attempted murder of a child.  There's no evidence in that regard at all.  It's totally out of line–
>
> The Court: It's up to the jury to remember what the evidence is, Mr. Lawrence. I will tell the jury this is argument and they can draw any inferences –
>
> Mr. Lawrence: We move for a mistrial your Honor.
>
> The Court: Wait a minute. Let me finish.  They can draw any lawful inferences they care to draw from the facts proven. Your motion for mistrial is hereby denied.
>
> Ms. Brooks: The Defendant didn't tell you about that, did he.  Didn't explain to you how that bullet got in the wall 'cause he didn't want you to know that he would try to kill an innocent two year old.  And we know this little boy, this little boy sat by and watched his momma bled (sic) to death on the floor. You can see in this photograph the tissue where he, the little boy, tried to wipe the blood up and help his momma as she lay there. And what did this defendant do? What did he do?  He tries to get rid of the last piece of evidence in the case, the little boy. But he doesn't have any bullets left in his gun so he's got to flee 'cause he's fired the shot and he told you in his statement I was afraid they heard the pistol go off.

Vol. X, Tab 10, R. 1367-1368.

After Knotts's counsel gave their closing arguments, the prosecutor in her closing remarks stated, in reference to the third bullet, "Where did the bullet go? Not into the victim, who was defenseless, not into the little boy who he missed."  Vol. XI, Tab 10, page 1413.

Knotts has also challenged the prosecutor's exhortation to the jury to place itself in the victim's position.  The prosecutor's comments in that regard were as follows:

> Ms. Brooks: . . .  Can you imagine the little boy in this shirt, hearing the first shot, running to his mother, seeing her on the ground.  Can you imagine? Can you imagine what it was like for that little boy.  Can you imagine what it was like for momma in her dying last seconds, conscious, conscious on that floor there with the pain of the first bullet, with the pain of the second one that nearly went all the way through her, puncturing both lungs and the aorta, wondering in her last moments what must have seemed like an eternity to her.  Will my little boy be all right? Unable to do a thing about it.

> Vol. X, Tab 10, page 1369.

Knotts also points out that the prosecutor said that the son had nightmares and that the son sat by while his mother bled to death.  Knotts also challenges the admission, over defense objections, of the autopsy photographs of Helen Rhodes and a crime scene video.  Other photographs of the son and his clothes and toys were also admitted.

The State contends that the allegedly improperly admitted evidence and crime scene video argument was not part of the habeas petition and are, therefore, defaulted.

In his reply, Knotts argues that the photographs are factual support for the claim of prosecutorial misconduct and Knotts is not required to present to the state court each example that supports his claim.

As outlined in the Magistrate Judge's Report and Recommendation on procedural default issues, adopted by Order of this court, the State conceded that various portions of the prosecutorial misconduct claim were properly before the court, and the Magistrate Judge

9

accepted this concession.  The non-procedurally defaulted aspects of the claim as conceded by the respondent are as follows: the prosecutor's argument urging the jury to assume the perspective of the victim or her child and the admission of autopsy photographs and photographs of the victim's son.  See Report and Recommendation (Doc. #49) at page 13.  Therefore, these aspects of the claim are properly before this court.  The court will not consider the admission of the crime scene video as it was not mentioned in the habeas petition. See Doc. #1 at pages 13-14.

Knotts also challenges statements made that Knotts was a Rambo who was lying in wait, that he intended to eliminate Helen Rhodes to show her who was boss, and that he was stalking Helen Rhodes.  Knotts challenges these statements as unnecessarily inflammatory.

The State points out that this aspect of the claim was found to be procedurally defaulted in the Magistrate Judge's Recommendation which was adopted by the court.  See Report and Rec. (Doc. #49) at pages 19-21. This recommendation has previously been adopted by the court. Order Adopting Recommendation (Doc. #110).

Having examined the evidence properly considered as part of the prosecutorial misconduct claims in this case, the court now turns to the issues of whether the conduct was improper, and whether there is a reasonable probability that the omission of such conduct would have made a difference.

With respect to the comments by the prosecutor asking the jurors to put themselves in the victim's and her son's shoes, the Alabama Court of Criminal Appeals acknowledged that such comments might be calculated to inflame the jury and under different facts "would be highly questionable," but concluded that the comments did not "so affect this jury" because the jury did not recommend death.  Vol. XXXVII, Tab 4, page 73.  The comments were, however, made

during the closing arguments of the guilt phase and the jury convicted Knotts of capital murder, the most serious crime of which he could have been convicted.  In any event, the effect of the comments is an issue separate from whether the comments were proper.  The Court of Criminal Appeals made no finding as to the appropriateness of the comments, other than to state that under other facts they would be highly questionable.

Upon review of the evidence cited by Knotts, this court agrees with Knotts that, to the extent that evidence was properly admitted, arguments made by the prosecutor that Knotts attempted to, but failed to kill the two-year-old boy, and that the jury should put themselves in Helen Rhodes's and her son's position, complete with evidence including autopsy photos, were improper.  Concluding that comments by the prosecutor at Knotts's trial were improper does not end the inquiry, however.  To grant habeas relief, this court must also find that had the conduct not occurred, there is a reasonable probability that the outcome would have been different.

The Alabama Court of Criminal Appeals stated that the comments that the third bullet was fired at the child was a reasonable inference drawn from the evidence and that the evidence was admissible as part of the res gestae.  The State urges this court to give a presumption of correctness to these findings.  Knotts responds that mixed questions of law and fact are not entitled to a presumption of correctness.  Knotts also disputes that the res gestae analysis is appropriate because the only evidence regarding the bullet was its placement, and some testimony that the bullet had skipped off the counter.

The presumption of correctness found in AEDPA "applies equally to factual determinations made by state trial and appellate courts."  Bui v. Haley, 321 F.3d 1304, 1312 (11th Cir. 2003).  "However, the statutory presumption of correctness applies only to findings of

fact made by the state court, not to mixed determinations of law and fact." Parker v. Head, 244

F.3d 831, 836 (11th Cir. 2001), cert. denied, 534 U.S. 1046 (2001).

The court agrees with Knotts that a finding that an inference from the facts was

reasonable is not merely a fact finding, but is a mixed question of law and fact; therefore, this

court does not presume that finding to be correct.  "The prosecutor should not project [her] own

response onto the community's representatives by unreasonable inferences from flimsy

evidence." Tucker v. Kemp, 762 F.2d 1496, 1509 (11th Cir. 1985).

With respect to the arguments that the jurors ought to put themselves in Helen Rhodes's

and her son's place, this court concludes that the Alabama Court of Criminal Appeals'

determination that Knotts was not prejudiced because the jury did not recommend a sentence of

death is an unreasonable determination, because it assumes based on the penalty that the jury

was not affected, without applying any of the factors of analysis applied under federal law.

In Supreme Court precedent, there are factors which, when applied by a court reviewing

the totality of a judicial proceeding, can allow for the conclusion that no constitutional violation

occurred even when a prosecutor made improper comments.  See Darden v. Wainwright, 477

U.S. 168, 182  (1986).  The prejudicial effect of improper comments has been found to have

been weakened where the comments are "followed by defense argument which ameliorated the

error." Romine v. Head, 253 F.3d 1349, 1369 (11th Cir. 2001).  The Supreme Court also finds it

significant when the trial court instructs the jurors several times that their decision is to be made

on the basis of the evidence alone and that the arguments of counsel were not evidence.  Darden,

477 U.S. at 182.   A great deal of significance is also placed on the weight of the evidence

against petitioner.  Id.  As the Eleventh Circuit has explained, "where the evidence against the

accused is very strong, in order to merit relief, prosecutorial misconduct would have to be even more egregious and pervasive than in cases where the evidence is less compelling . . . ." Davis v. Zant, 36 F.3d 1538, 1546 (11th Cir. 1994). The Eleventh Circuit has also explained that isolated, ambiguous, or unintentional remarks are to be viewed with "lenity." Romine, 253 F.3d at 1369. As re-stated by the Eleventh Circuit the relevant factors of analysis are as follows: 1) the degree to which the challenged remarks have a tendency to mislead the jury and to prejudice the accused, 2) whether they are isolated or extensive, 3) whether they were deliberately or accidentally placed before the jury, and 4) the strength of the competent proof to establish the guilt of the accused. Davis, 36 F.3d at 1546.

The remarks in this case were deliberately placed before the jury and, although extensive within the argument itself, did all occur during the closing argument of the case. The evidence upon which the arguments relied, of course, was admitted during the trial.

Knotts has argued that the prosecutor's argument with respect to an intent to shoot Helen Rhodes's son implicated other specific rights of the accused because he was in effect tried for a crime of attempted murder with which he had not been charged. See Darden, 477 U.S. at 182. Although the Supreme Court has recognized the implication of rights as being relevant to the analysis of a prosecutorial misconduct claim, the rights identified as being relevant to this analysis are the right to counsel or the right to remain silent. Id. In this case, those rights are not implicated. Further, it is clear that the jury was not charged as to any attempted murder theory. In addition, in his closing argument, Knotts's counsel, Paul Lowery ("Lowery"), specifically pointed out that Knotts had not been charged with attempted murder. Vol. X, Tab 10, page

1394.  Lowery argued "You know if he had intended to kill that little boy there would be an indictment.  There would be a count in that indictment, wouldn't it?"  Id.

        In this case, although the objectionable content was not invited by and was not responsive to the summation of the defense, the prejudicial effect of improper comments was followed by defense comments which ameliorated the prejudicial effect.  Knotts's counsel, Lawrence, argued in his closing argument after the prosecutor's comments that the jury should accept Knotts's statement that he had no intention of hurting the child, that there was no reason to believe he had any intention to hurt the child, and that the only reason the prosecutor made the argument was to inflame the jury's emotions. Vol. X, Tab 10, page 1385.  He further stated that the argument that he intended to hurt the child does not "abide by the evidence at all."  Id.  Lowery stated that the prosecution was willing to accept Knotts's statement in many regards, but was not willing to take as true his statement that he went to the house with an intent to kill, but not to steal or burglarize and not to slay a little child.  Id. at 1394.  He stated that the prosecution's argument was unreasonable and inflammatory and prejudicial. Id.  As earlier stated, he also said, "You know if he had intended to kill that little boy there would be an indictment.  There would be a count in that indictment, wouldn't it?"  Id.  This particular line of argument falls within a factor of analysis considered by the Supreme Court to be significant; namely, that "Defense counsel were able to use the opportunity for rebuttal very effectively, turning much of the prosecutors' closing argument against them by placing many of the prosecutors' comments and actions in a light that was more likely to engender strong disapproval than result in inflamed passions against petitioner."  Darden, 477 U.S. at 182-183.  Lowery continued by saying that Knotts said he started to take the boy with him so he did not have to

watch his mother, but did not have time, and that the jury should believe that statement.  Vol. X, Tab 10 at 1395.  These comments were also responsive to the prosecutor's argument to the jury that they should consider that the little boy was left with his mother.  Lowery further argued that when a trial advocate does not have enough evidence, an advocate dresses up the truth, like selling a used car, and that that was the purpose of the prosecutor's argument. Id.  He told the jury to be fair, to discount the argument because it was not true, to put it out of their minds, and to look at the evidence. Id. at 1396.

Another relevant factor in this court's analysis is the trial court's instructions. The Supreme Court has found it significant that a "trial court instructed the jurors several times that their decision was to be made on the basis of the evidence alone, and that the arguments of counsel were not evidence." Darden,  477 U.S. at 182.   In this case, the court charged the jury that closing arguments by the lawyers are not evidence.  Vol. XI, Tab 10, page 1428.  He further stated that it was up to the jury to decide whether in closing arguments the lawyers actually argued what the evidence really is and that the closing summation is simply argument. Id. at 1428-29.  He continued by stating, "Now if either one of the lawyers stated anything during closing argument that you do not remember being accurate or it doesn't reflect your recollection of the evidence, or you don't find the evidence to be what either one of the lawyers say, then you're to disregard what the lawyer said because it's not evidence anyway, it's simply argument." Id.  at 1429.

While this charge came at the end of all of the evidence, that fact is not dispositive.  The Eleventh Circuit has explained that an "on-the-spot curative instruction from the court can make a difference, or failing that, improper argument can sometimes be remedied by the final

15

instructions to the jury." <u>Romine</u>, 253 F.3d at 1369.   Furthermore, in this case the trial court said, in the presence of the jury at the time of the prosecutor's remarks regarding Knotts's alleged attempt to kill the child, that he would "tell the jury this is just argument and they can draw any inferences they care to draw from the facts proven."  <u>Id.</u> at 1367.  Therefore, there is evidence from which to conclude that the jury was aware that the instruction regarding arguments of lawyers pertained not only to the closing arguments, but particularly to the objectionable comments about Knotts's alleged attempt to shoot the child.

With respect to the improper arguments that the jury should consider Helen Rhodes and her son and put themselves in their places, including the evidence offered into evidence by the prosecutor and pointed to during her arguments, the trial court instructed the jury that the verdict must not be based on sympathy, either for the defendant or the deceased. Vol. XI, Tab 10, page 1431.  He also instructed them that their verdict could not be based on bias or prejudice and that sympathy, bias, and prejudice have no place in a court of law. <u>Id.</u>  At the end of the charge, the trial court again instructed the jury that their verdict was to be based on the evidence and law and that they were not to use any sympathy. <u>Id.</u> at 1464.

As stated above, a great deal of significance is placed on the weight of the evidence against petitioner in deciding whether prosecutorial misconduct rose to the level of a constitutional violation.  Here, the weight of the evidence regarding the fact that Knotts shot and killed Helen Rhodes was overwhelming.  Knotts had given a statement outlining his actions leading up to and including the killing of Helen Rhodes.  The only equivocation in Knotts's statement was his intent when he actually fired the gun. When first asked whether he intended to shoot at Helen Rhodes Knotts responded "yes sir," and acknowledged that he went there to shoot

her. Vol. XVII, Tab 18, page 62.  It was when he was asked why he shot her that he articulated

an explanation that he was not sure he actually shot her for the reason he originally intended to,

and that he thought he shot her because he panicked.  Id.  There was also forensic evidence

which corroborated Knotts's statement that he shot and killed Helen Rhodes.

The court has considered the comments of the prosecutor within the context of the

closing arguments of counsel, the court's instructions, and the testimony presented.  The court

has also considered the evidence pointed to by the prosecutor in making her arguments. The

court has no hesitation in concluding that the prosecutor acted improperly.  After careful

consideration of this evidence, both as individual instances and when taken together, in light of

the relevant factors of analysis, the court finds that the evidence of intentional killing, and of the

commission of robbery and burglary during the course of that intentional killing, combined with

the curative instructions and ameliorative arguments, points to the conclusion that there is not a

reasonable probability that without the prosecutor's improper arguments regarding Knotts's

alleged attempt to kill the child and/or exhortation to the jury to place themselves in Helen

Rhodes's and the child's place, including the evidence pointed to, the outcome of the trial would

have been different and the jury would not have convicted Knotts of capital murder.  The court

concludes, therefore, that Knotts is not entitled to relief on these aspects of this claim.

It appears to the court that the habeas petition points to the prosecutor's admission of

autopsy photographs and photographs of Helen Rhodes's son as a basis for a separate

prosecutorial misconduct claim.  The Respondent has not contended that such a claim is

procedurally defaulted.  See Joint Report (Doc. #28) at page 2.   Clearly, the Petitioner has

argued that this evidence was improperly pointed to during closing argument in an attempt to

inflame the jury, which has been addressed above.   Knotts has not presented any separate

argument to demonstrate that the mere admission of the evidence was so prejudicial that without

it, the outcome probably would have been different.   Knotts has cited the court to precedent,

such as United States v. Hands, 184 F.3d 1322 (11th Cir. 1999), which found error in the

admission of evidence.  Whether or not the prosecutor's actions in offering the evidence were

improper, however, to the extent that a separate argument has been advanced that the admission

of this evidence, separate and apart from the prosecutor's reliance on them during oral argument,

violated Knotts's constitutional rights, the court concludes that Knotts has not demonstrated that

there is  a reasonable probability that without the mere admission of the evidence the outcome of

the trial would have been different.

B.  Claim that Trial Judge Rendered Incomprehensible Jury Instructions that Were
Fraught with Errors

Knotts has challenged various aspects of the trial court's oral charge.  He states that the

court failed to give, or gave a confusing, felony murder charge.  Knotts also contends that the

trial court amended the indictment by charging with the generic words of the statute rather than

the specific words used in the indictment, and failed to charge the jury that they had to

unanimously find either robbery murder or burglary murder.  Finally, Knotts contends that the

trial court improperly instructed the jury that they had to reconcile the testimony where all of the

witnesses were prosecution witnesses.  Knotts contends that this argument created a presumption

of truth and usurped the jury's role in making credibility determinations.  The court will address

each of these claims in turn.

1.  Felony Murder Charge

18

Knotts contends that the trial court initially failed to give a felony murder charge and then gave one which Knotts describes as incomprehensible.  Knotts relies on <u>Boyde v. California</u>, 494 U.S. 370 (1990), for the proposition that an ambiguous jury instruction violates a defendant's Eighth Amendment rights, and <u>Beck v. Alabama</u>, 447 U.S. 625 (1980), for the proposition that a jury must be permitted to consider a lesser included noncapital offense where the evidence supports such a verdict.

Knotts contends that the trial court's failure to properly instruct the jury on the lesser included offense of felony murder impaired his defense.  Knotts points out that initially the trial court failed to give a felony murder instruction, and later gave the instruction only when requested to do so.  Knotts argues that even though the language ultimately used in the charge tracked the state felony murder statute, the jury could not have known the significance of the final instruction or that it was an alternative to capital murder.

Insofar as there is an alleged due process violation, this court may not simply "judge portions of the jury charge, or even the entire charge, standing alone.  A defendant's right to due process is not violated unless an erroneous instruction, when viewed in light of the entire trial, was so misleading as to make the trial unfair."  <u>Agan v. Vaughn</u>, 119 F.3d 1538, 1545 (11th Cir. 1997), <u>cert. denied</u>, 523 U.S. 1023 (1998).

The instruction which contained the felony murder instruction was given after a discussion outside the presence of the jury and after the jury had been charged as to the law.  The instruction was as follows:

Ladies and gentlemen, on the charge of murder, I charge you a person commits the crime of murder if wi the death of that person or of another person.  I'll continue with: He commits or attempts to commit–or he commits or attempts to commit burglary in the first or second degree, robbery in any degree, or any other felony clearly dangerous to human life, and, in the course of and in

furtherance of the crime he is committing or attempting to commit, or in immediate flight therefrom, he, or another participant if there be any, causes the death of any person.

Vol. XI, Tab 10, at page 1481.

Clearly, a charge was given which, while not identifying the concept of "felony murder" as such, defined murder in two different ways, including the felony murder definition. This included repeating the definition of murder which had previously been given the jury and which had been identified as a lesser included offense of capital murder, <u>see</u> Vol. XI, Tab 10, page 1452, and then adding the felony murder definition. The charge ultimately given was consistent with the approach taken by the two different closing arguments by Knotts's counsel in which they argued that Knotts's intent changed and he panicked, so was guilty of murder, not capital murder, Vol. X, Tab 10, page 1387, and also that he intended to kill Helen Rhodes, but did not engage in the additional conduct that would render the killing capital murder. <u>See</u> <u>id.</u> at page 1397. The closing argument which identified the non-intentional definition of murder did not use the term "felony murder," so contrary to Knotts's argument, rather than impair his defense, the jury charge was consistent with counsel's approach. Giving two definitions of murder as an alternative to capital murder was also consistent with a charge given at a later point in the trial, wherein the foreman of the jury informed the court that the jury had a question as to how to fill out the verdict form for the capital offense. The jury was instructed as follows:

If the jury is satisfied that the state has proven its case against the defendant of capital murder and that that will be in the verdict of the jury, then the jury need go no further, okay? If the jury finds that the state has not proven capital murder but has proven murder, which is a lesser included offense, the jury could find the defendant guilty of murder. If it has not been proven capital murder but robbery in the first degree and burglary in the first degree, it could be a combination of the three: Murder, robbery in the first degree, burglary in the first degree. If you're

20

not satisfied that the state has proven any offense then it would be: We, the jury,
find the defendant not guilty.

Vol. XI, Tab 10, page 1499.

This instruction emphasized that a finding of murder, previously defined in two ways,

was an alternative to a finding of capital murder.

The Alabama Court of Criminal Appeals concluded that the felony murder charge was

given, and, after a thorough review of the charge and the evidence as it related to the charge,

found that although the charge was not as clear as it could have been, the jury was not misled by

it.  Knotts, 686 So. 2d at 453-58.  After a review of the record in this case, considering the entire

jury charge and the instruction given to the jury in response to its question, and considering the

argument of counsel, it appears to the court that the Alabama Court of Appeals' decision was not

an unreasonable application of clearly established Federal law as determined by the Supreme

Court of the United States.  The charge, and the manner in which it was given, did not make the

trial unfair.

     2.   Claim that the Court's Charge Constructively Amended the Indictment

Knotts states that the trial court constructively amended the indictment against him

because the court used the generic elements of the crimes as written in the statute rather than the

elements of the crime as recited in the indictment.

In resolving this claim against Knotts, the Alabama Court of Criminal Appeals

determined that "the crimes charged were so clearly defined and presented that it would be

highly improbable that the jury would have been misled by the trial court's instructions on

robbery and burglary."  Vol. XXXVII, Tab 4, page 46.

A defendant can only be convicted for a crime charged in the indictment. United States v. Keller, 916 F.2d 628, 633 (11th Cir.1990), cert. denied, 499 U.S. 978 (1991).  Jury instructions which amend an indictment can violate the constitution.  See Stirone v. United States, 361 U.S. 212 (1960).  "A jury instruction that constructively amends a grand jury indictment constitutes per se reversible error because such an instruction violates a defendant's constitutional right to be tried on only those charges presented in a grand jury indictment and creates the possibility that the defendant may have been convicted on grounds not alleged in the indictment."  United States v. Cancelliere, 69 F.3d 1116, 1121 (11th Cir. 1995).

Knotts argues that the Alabama Court of Criminal Appeals unreasonably applied federal law when it found that the trial judge did not constructively amend the indictment in light of the evidence presented at trial.  Knotts points out that the indictment charged Knotts with robbery-murder, causing the victim's death during the "course of committing a theft of a 1989 Toyota Corolla, jewelry, shoes, clothing and bags . . . ." Vol. XXVI, Tab 19, Page 36.  The second count charged Knotts with burglary murder, stating that he killed Helen Rhodes in the course of unlawfully entering or remaining in her home with the intent to commit the crime of Murder, Robbery, and/or Theft of Property . . . ." Id. at page 37.

In United States v. Salinas, 601 F.2d 1279 (5th Cir. 1979), the federal district court committed reversible error by charging under the terms of a statute, which included any defendant who is an officer, director, or employee, whereas the defendant in the case was only indicted as being a director.  The court reasoned that the instruction was error because it may have allowed the defendants to be convicted on a ground that was not charged. Id. at 1290.

In <u>United States v. Leichtnam</u>, 948 F.2d 370 (7th Cir.1991), a case cited favorably in <u>Cancelliare</u>, 69 F.3d at 1121, the indictment charged that the defendant knowingly used and carried a firearm, to wit a Mossberg rifle.  At trial, the judge then instructed the jury that it could convict if the defendant had used a firearm. On appeal, the Seventh Circuit reversed the conviction, holding that "the introduction of the handguns, together with the jury instructions, impermissibly amended the indictment by broadening the possible bases for conviction to include knowingly using or carrying any firearm." <u>Leichtnam</u>, 948 F.3d at 380-81.

In this case, unlike <u>Leichtnam</u>, there was no evidence of other items stolen which was proven instead of the items charged in the indictment.  Knotts's argument with respect to the burglary charge was that in charging the jury that it could convict on burglary-murder if it concluded that Knotts entered Helen Rhodes's home with an intent to commit any crime, the trial court allowed conviction if the jury found Knotts entered the home with the intent to commit any crime, including crimes not charged in the indictment.  There was, however, no evidence presented of any crime other than those which were charged in the indictment.  The court concludes, therefore, that the Alabama Court of Criminal Appeals did not unreasonably apply federal law set forth by Supreme Court cases.

3.  Claim that Judge Did Not Require Unanimity as to Robbery-Murder or Felony-Murder

Knotts argues that the failure to charge the jury that they must find either robbery or burglary unanimously meant that some jurors could have concluded that he was guilty of robbery and others of burglary.

The Alabama Court of Criminal Appeals acknowledged that the general instruction on unanimity in the case raised the possibility that the jury was not adequately informed that its duty

was to agree to an unanimous verdict as to each count.  The court reasoned, however, that although in the average case it is difficult to discern from the jury's general verdict what count or counts the verdict was based on, in this case the court could conclude that the jury convicted Knotts of both counts. Vol. XXXVII, Tab 4 at page 56.

Knotts contends that there was no evidence in the case that he intended to make the victim of the theft acquiesce to the taking, so that a reasonable jury could not have found him guilty of robbery.   The facts as presented at trial, however, were more than that Knotts simply stole a car to escape as an after thought. Instead, in his taped confession, Knotts stated several times that he intended to steal a car.  He stole a screw driver to help him do so, and later stole a gun so that he could "scare somebody" out of a car.  Vol. XVII, Tab 18, pages 37, 48.  He also testified that at the time he stole the car he was not thinking about taking the car.  Id. at page 60. Just as the jury must have accepted portions and rejected portions of his testimony as to his intent with regard to the murder, however, they might also have done so with regard to his testimony about his intent to steal the car.  Therefore, this court finds that the Alabama Court of Criminal Appeals' decision that the jury could have concluded that Knotts was guilty of both crimes was not contrary to, or did not involve an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; nor was it a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Knotts also argues that the burglary statute allows for impermissible double counting because it could allow for a jury to conclude that the crime a defendant intended to commit upon entering the dwelling was the murder itself.

The Respondent argues that any argument by Knotts that any conviction on burglary murder was improper has never before been raised in the context of the unanimity claim and is, therefore, procedurally defaulted. The court agrees that this argument goes beyond the unanimity argument and must be addressed only in the context in which it has properly been raised.

4.  Claim that Trial Judge Erroneously Instructed the Jurors to Reconcile Testimony

With respect to the charge to the jury members that they had "to reconcile the testimony," Knotts argues that the charge violated his constitutional rights because the bulk of the witnesses were prosecution witnesses and so to instruct the jury in this manner meant that there was a presumption of truth in favor of the State's evidence.  In support of his argument, Knotts cites Sandstrom v. Montana, 442 U.S. 510 (1979), in which a jury was erroneously instructed that the law presumes that a person intends the ordinary consequences of his voluntary acts.

The Alabama Court of Criminal Appeals determined that the trial court's charge, when weighed with other charges dealing with the responsibility of the jury to access the credibility of witnesses and to weigh the evidence did not invade the province of the jury.  Vol. XXXVII, Tab 4, page 57.  Knotts responds that this charge followed the charges on witness credibility, so that the jury was charged that the first responsibility was to reconcile the testimony.

This court has reviewed the trial court's charge in its entirety.  The jury was charged in pertinent part, including the portion challenged by Knotts, as follows:

> Now the law says if you find differences or discrepancies in the testimony, your first job is to reconcile it and mash it together and make it all speak the truth. Now if you find that you can't do that, that there's just some testimony that stands out because it's not credible or worthy of belief, then the law says you can disregard that testimony that you do not find credible or worthy of belief as long as you do not disregard any witness' testimony arbitrarily and capriciously.

Vol. XI, Tab 10, page 1464.

While the challenged language was certainly unnecessary, the court cannot conclude that the determination that it did not unconstitutionally shift the burden of proof to Knotts is unreasonable.  This case, unlike <u>Sandstrom</u>, is not a case in which the defendant's actions were referenced.  Instead, the jury was told to reconcile discrepancies in evidence, but was also told that it had to weigh credibility and that if it could not reconcile discrepancies, it should disregard evidence it did not find credible or worthy of belief.  The court concludes, therefore, that Knotts is not entitled to relief on this claim.

C.  Claim that the Trial Court Refused to Excuse for Cause Several Jurors Who Were Clearly Not Qualified to Serve

Knotts identifies Charysse Alexander, Fred Brown, Gerald Bowen, Karin Carmichael, John Dale, Valarie Foster, Donald Gainor, and Jimmy Hicks as prospective jurors whom he contends expressed bias and/or a predisposition against him, and whom he contends should have been excused for cause.  Six of these venire members identified are alleged by Knotts to have expressed an intention not to consider mitigating factors in considering the death penalty.  For instance, Knotts has pointed to prospective juror Valarie Foster who stated that if the state proved premeditation, she would be inclined to vote for the death penalty, and initially stated that she would not consider age to be a mitigating factor.  When asked whether she would consider age to be a mitigating factor if instructed by the court to do so, however, she said she would, along with other mitigating evidence.  Vol. VI, Tab 10 at page 407.[2]  The State argues

---

[2] In <u>United States v. Chandler</u>, 996 F.2d 1073, 1103 (11th Cir. 1993), a prospective juror stated that a defendant's age would not affect her recommendation for or against a death sentence. The court reasoned that her statement that she would not consider age and another statutory mitigating factor was made in ignorance of the mandates of state law.  <u>Id.</u> The court explained that jurors are not expected to know the law prior to being properly instructed.  <u>Id.</u> The court also found it important in concluding that there was no error in failing to excuse the juror

that the Alabama Court of Criminal Appeals acted reasonably in determining that the trial court did not abuse his discretion when he did not excuse these venire members for cause.

Knotts cites to Irvin v. Dowd, 366 U.S. 717 (1961), for the proposition that a criminal defendant is entitled to an impartial jury.  Knotts apparently acknowledges that the challenged prospective jurors in the instant case were removed with peremptory challenges, but argues that the fact that jurors bearing prejudice were removed by peremptory challenge rather than for cause does not remove the constitutional violation because it is error for a court to force a party to use peremptory challenges on jurors who should have been excused for cause, citing United States v. Nell, 526 F.2d 1223, 1229 (5th Cir. 1976).

Although not argued by the State, federal law is clear that claims that the jury was not impartial must focus on the persons who actually sat on the jury.  Spivey v. Head, 207 F.3d 1263, 1273 (11th Cir. 2000); cert. denied, 531 U.S. 1053 (2000); see also Heath v. Jones, 941 F.2d 1126, 1133 (11th Cir. 1991) (holding that habeas petitioner can only raise the trial court's denials of challenges for cause of those venire members who eventually sat on the jury), cert. denied, 502 U.S. 1077 (1992).  In Ross v. Oklahoma, 487 U.S. 81 (1988), the defendant exercised a peremptory challenge to cure the trial court's error in denying a challenge for cause. The Supreme Court rejected the position that, without more, "the loss of a peremptory challenge constitutes a violation of the constitutional right to an impartial jury." Id. at 88.  The Supreme Court held that as long as the jury that sits is impartial, "the fact that the defendant had to use a

---

for cause that the prospective juror stated that she would follow the district court's instructions in arriving at her decision. Id.

peremptory challenge to achieve that result does not mean the Sixth Amendment was violated."
Id.

By stating in his brief that his attorneys were forced to use peremptory challenges to remove unsuitable jurors, Knotts appears to concede that none of the challenged prospective jurors sat on his jury. Knotts certainly has not argued, nor pointed to any evidence in the record, that the prospective jurors he has challenged sat on his jury. Furthermore, the evidence that Knotts's counsel was given fifteen peremptory challenges, Vol. VII, Tab 10, page 628, and the fact that he points to eight venire members whom he says should have been removed for cause, indicates that he was allowed more challenges than he needed to remove the challenged prospective jurors. Under Ross and Spivey, therefore, the court cannot conclude that the Alabama Court of Criminal Appeals unreasonably applied federal law set forth by Supreme Court cases.

II.  Claims of Ineffective Assistance of Counsel During the Guilt- Innocence Phase

There is a two-pronged test for determining whether a defendant was deprived of effective assistance of counsel. First, the performance must have been deficient under an objective standard and second, the errors in performance must have been "so serious as to deprive the defendant of a fair trial, a trial whose result was reliable." Strickland v. Washington, 466 U.S. 668, 687 (1984). "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." Strickland, 466 U.S. at 688. Once deficient performance is shown, to establish prejudice a petitioner must show that there is "a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different." Id. at 694. The prejudice component of the Strickland test focuses

28

on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair.  Unreliability or unfairness does not result if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law entitles him. Williams v. Taylor, 529 U.S. 363, 393 n. 17 (2000).

A.  Claim that Defense Counsel Affirmatively Undermined Petitioner's Viable Defense

Knotts argues that defense counsel affirmatively undermined his viable defense.  Knotts points out that Lawrence argued in closing that Knotts originally had an intent to kill, then his intent changed and he panicked and the shooting was as a result of that panic. Vol. X, Tab 10, Page 1386.  His co-counsel, Lowery, presented a second closing argument and said that Knotts intended to kill Helen Rhodes and carried out that intent and that was murder, but not capital murder. Id. at page 1399.  Knotts argues that prejudice resulted from this error because there is a reasonable probability that he would not have been found guilty of murder with the aggravating circumstance of robbery or burglary.  Knotts further states that "[m]inimally competent counsel would have easily argued that the evidence supported either unintentional killing or premeditated murder, but not intentional killing in the course of a burglary or robbery."  Petitioner's Brief, at page 93.  Knotts challenges any strategy in which the two lawyers contradict one another.  In essence, what Knotts is arguing is that in having two different attorneys present closing arguments with alternative theories, they appeared to contradict one another, rather than making the argument that there were two alternatives other than capital murder.

A court must not second-guess counsel's strategy. Chandler v. United States, 218 F.3d 1305, 1314 n.14 (11th Cir. 2000).  The Eleventh Circuit has explained that strategy means "no more than this concept: trial counsel's course of conduct, that was neither directly prohibited by

law nor directly required by law, for obtaining a favorable result for his client." <u>Id.</u>  In this case, Knotts's counsel made a decision to have two different attorneys argue two different theories of defense.  That is, one attorney argued that he was not guilty of intentional murder at all, only felony murder, and the other argued that if there was an intentional murder, it was not during the course of a robbery or burglary, and so was not capital murder.  As the Magistrate Judge noted in the Recommendation on Stage I issues in this case, there is evidence that Knotts's counsel consistently employed a strategy of conceding that there was a killing, but arguing that this was not a capital murder case.  Knotts gave statements to the police in which he admitted killing Helen Rhodes and that statement was admitted at trial.  In the face of such evidence, upon a de novo review of this claim, the court cannot conclude that trial counsel's strategy was unreasonable, and concludes that Knotts is not entitled to relief under § 2254 on that basis.

## B.  Claim that Defense Counsel Accepted Knotts's Guilt

Knotts contends that his attorneys accepted his guilt.  Knotts points out that the summation ended with a request for a finding of murder, not capital murder.  Knotts has also identified the aspect of Lowery's closing argument in which he referred to the escape charge as one of the key charges, that he praised the State's case, and that he argued that all defendants are entitled to a fair trial.   Lowery did not admit, however, that Knotts was guilty of escape.  Furthermore, although Lowery's argument may have been inartful, conceding Knotts's actions and arguing that Knotts committed murder, but not capital murder, was not conceding that Knotts was guilty of capital murder.  As stated above, the Magistrate Judge noted in the Recommendation on Stage I issues in this case that Knotts's counsel consistently employed a

30

strategy of conceding that there was a killing, but arguing that this was not a capital murder case. Knotts's attorneys did not admit his guilt at the guilt- innocence phase, but only that he killed Helen Rhodes, a fact that was admitted in Knotts's statement to authorities.

As for the comments in closing argument complimenting the State's case or presentation of evidence, it is a recognized trial strategy to gain credibility in the jury's eyes by conceding strengths in an adversary's case. See, e.g., Haynes v. Cain, 298 F.3d 375, 382 (5th Cir. 2002). The role of the court is not to second guess the wisdom of strategic decisions made by counsel. Upon a de novo review of the Rule 32 court's denial of this claim, the court concludes that Knotts has failed to establish that he is entitled to relief on this claim under § 2254.

### C.  Claim that Lowery Slept During Parts of the Trial

Knotts contends that Lowery slept during parts of the trial.  Knotts relies on the holding of the Fifth Circuit that there is a presumption of prejudice when counsel sleeps during critical moments of the trial.  Burdine v. Johnson, 262 F.3d 336 (5th Cir. 2001), cert. denied, 535 U.S. 1120 (2002).  Knotts acknowledges that he was represented by two attorneys, but states that Lawrence was a bankruptcy attorney who had never tried a capital case before, and Lowery was the only member of the trial team with any capital experience.

Knotts challenges the fact-finding of the Rule 32 court because he contends that the Judge improperly made himself a witness by testifying that Lowery did not sleep, and that the Alabama Court of Criminal Appeals wrongfully upheld this fact-finding.  This court need not reach the issue of whether this finding is supported by the evidence, however.  Under federal law, repeated instances of sleeping on the part of counsel is considered to be the same as absent

counsel, and when a defendant does not have counsel at every critical stage of a criminal proceeding, the court must presume that such egregious deficiency prejudiced the fairness of the trial. Burdine, 262 F.3d at 348.  In this case, however, Knotts was represented by two attorneys and only argues that one of them slept during parts of the trial.  Therefore, Knotts was not deprived of counsel even if Lowery slept during parts of the trial and Knotts is not entitled to a presumption of prejudice.  See, e.g., McFarland v. State, 928 S.W.2d 482, 505-6 (Tex. Cr. App. 1996) (capital murder defendant was not denied effective assistance of counsel by fact that his lead counsel slept through parts of trial; defendant had two attorneys and thus was never without counsel), overruled in part on other grounds, Mosley v. State, 983 S.W.2d 249, 263 (Tex. Crim. App. 1998).

Knotts states that had Lowery been awake, he might not have contradicted his co-counsel's summation. Although Knotts has offered some conjecture as to the difference it might have made in the representation he received from both attorneys had Lowery not been asleep during a particular portion of the trial, there is nothing in the record to substantiate that the attorney was asleep during co-counsel's summation.  Knotts also argues, based on Neil Hartley's affidavit that Lowery slept through the showing of Knotts's taped confession at the district attorney's office, that had Lowery not slept through the tape, he might not have argued that Knotts intentionally killed Helen Rhodes.  The statement was offered at trial, however, and there is no evidence that Lowery was not familiar with its content.  This court concludes that, in light of Knotts's representation by two attorneys, even assuming that Lowery fell asleep at some point or points during the trial, Knotts is not entitled to a presumption of prejudice, and has not

otherwise demonstrated that he was prejudiced by Lowery's conduct.  Therefore, the court concludes that Knotts is not entitled to relief on this claim.

### D.  Claim that Counsel failed to challenge critical evidence

Although the heading for this claim is limited to ballistics evidence, it is evident from the petition, see Doc. #1 at pages 53-54, that the overall claim is that Knotts's counsel failed to challenge evidence, and that ballistics evidence is one part of that claim.  The court will address each part of this overall claim separately, beginning with the ballistics evidence arguments.

During the closing arguments by the State, the prosecutor argued both that Knotts shot at the victim's son and that Helen Rhodes was fatally shot while she was lying on the ground. Knotts contends that his counsel's failure to offer rebuttal testimony regarding the trajectory of the bullets, or to cross examine the State's witnesses on obvious weaknesses in their testimony, or to offer evidence that Helen Rhodes was not lying on the ground when fatally shot was ineffective assistance of counsel.

At the Rule 32 hearing, Knotts's counsel, Lawrence, testified that he realized the prosecution might argue that Knotts fired at the victim's son.  Vol. XLIV, Tab 1, page 264. Knotts states that had Lawrence inquired of his ballistics expert, he would have discovered that it was impossible to conclude that Knotts shot at the victim's son.  Knotts also points out that the State's ballistics expert testified that the third bullet might have skipped off the kitchen bar, but that Lawrence did not use this testimony to establish that it was impossible to determine the trajectory of the bullet.

Knotts argues that his counsel was per se incompetent under the authority of a case in which ballistics evidence could have shown that the defendant did not fire the fatal shot.  Harris

ex rel. Ramseyer v. Blodgett, 853 F. Supp. 1239, 1256 (W.D. Wa. 1994), aff'd sub nom. Harris By and Through Ramseyer v. Wood, 64 F.3d 1432 (9th Cir. 1995).  In this case, however, none of the evidence which Knotts contends should have been admitted would call into question whether he shot Helen Rhodes.  It would only, according to Knotts, have called into question the prosecutor's inference that Knotts attempted to shoot Helen Rhodes's child.

The prejudice pointed to by Knotts in arguing that the Strickland standard was met, is that Judge Price relied on the inference that Knotts shot at the young child and that the mother was alive for a period of time after having been shot in sentencing Knotts to death.  Knotts argues that had counsel shown that it was not possible for a second shot to have been fired while Helen Rhodes was on the ground and that there was insufficient evidence to infer that Knotts shot at Helen Rhodes's son, "there is a reasonable chance that Judge Price would not have sentenced Mr. Knotts to death."   Petitioner's Brief at page 103.  Therefore, although styled as a guilt- innocence phase claim, the prejudice pointed to establishes that this is a sentencing claim which has been rendered moot by Knotts having already been re-sentenced to life in prison.

Similarly, Knotts points out that Dr. James Lauridson testified at trial that Helen Rhodes may have remained conscious for as long as 30 to 60 seconds after having been shot.  Knotts argues in his brief that any experienced capital defense lawyer facing the prospect of a penalty phase should have recognized that this was highly important evidence.  Again, the prejudice that Knotts has pointed to is that pre-mortem suffering lies at the heart of the heinous, atrocious or cruel aggravating factor for imposing the death penalty.  Therefore, although styled as a guilt-phase claim, this is a penalty-phase claim which has been rendered moot by the court's granting of the petition as to the penalty phase claims.

34

Knotts also argues that defense counsel was ineffective by failing to stipulate to the child's size and age because such failure led to improper and prejudicial photographs of the child being admitted into evidence.  The prejudicial effect argued by Knotts has been addressed by the court in its discussion of the prosecutorial misconduct claim and conclusion that the admission of that evidence was not misconduct such that without it, the outcome of the trial would have been different.  Because there was no constitutional violation in the admission of the evidence, the failure to offer to stipulate to that evidence, assuming that such a stipulation would have been accepted by the State, is not ineffective assistance under <u>Strickland</u>.

E.  Claim that Defense Counsel Failed to Object to the Production of Witness Summaries

Knotts states that his trial counsel failed to object to an order of the trial court that he produce summaries of expected expert testimony at trial.  Knotts states that this requirement abridged the work-product and attorney-client privileges and gave the prosecution the ability anticipate and unfairly counter Knotts's defense. The State states that this claim was denied by the Rule 32 court as not having been supported by any evidence.  In her Report and Recommendation, the Magistrate Judge concluded that Knotts's trial counsel who testified at the Rule 32 evidentiary hearing was not questioned with respect to this claim.

Because no evidence was presented to the Rule 32 court, and because a hearing on the claim in this court was not allowed under applicable law, it is difficult for this court to evaluate the applicability of either <u>Strickland</u> prong of analysis.   Where "the record is incomplete or unclear about [counsel's] actions" courts presume that counsel exercised reasonable professional judgment.  <u>Chandler v. United States</u>, 218 F.3d 1305, 1314 n. 15 (11th Cir. 2000).  Upon a

review of the record, while a production of summaries may not have been required,[3] the court finds that the Petitioner has not demonstrated either that counsel was deficient, or that he suffered prejudice within the meaning of the Sixth Amendment.  Therefore, the court cannot conclude that the denial of this claim by the state court resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, or resulted in a decision that was based on an unreasonable determination of the facts in the light of evidence presented in the state court proceedings.

F.  Claim that Defense Counsel Failed to Move to Excuse Prospective Juror Alexander

Knotts has previously argued that the failure of the trial court to excuse prospective juror Charysse Alexander from the case was constitutional error.  He has also argued that his counsel's failure to move to excuse Alexander for cause was ineffective assistance of counsel.

In the previous discussion of the claim based on the trial court's failure to remove Charysse Alexander for cause, the court concluded that no constitutional error occurred because Charysse Alexander ultimately was not on the jury and Knotts had not demonstrated that his resulting jury was unfair.  The court concludes, therefore, that the conclusion that he was not prejudiced by his counsel's conduct is not unreasonable. See Cardenas v. Dretke, 405 F.3d 244 (5th Cir. 2005) (no Strickland violation where counsel did not object to the removal of jurors opposed to the death penalty when those jurors were properly removed).  Therefore, the court cannot conclude that the denial of this claim by the state court resulted in a decision that was

---

[3]  The court notes that Alabama Rule of Criminal Procedure 16.2, and its predecessor Temporary Rule 18.2, may have in fact authorized such discovery.  See Akin v. State, 698 So. 2d 228, 232 (Ala. Crim. App. 1996).  This argument has not been raised by counsel in this court, however.

contrary to, or involved an unreasonable application of clearly established federal law, or resulted in a decision that was based on an unreasonable determination of the facts in the light of evidence presented in the state court proceedings.

G.  Defense Counsel Failed to Object to Repeated Instances of Prosecutorial Misconduct

As previously discussed, Knotts has pointed to conduct on the part of the prosecutor which he contends was constitutionally objectionable.  He also argues that he was denied effective assistance of counsel because his attorneys objected to some instances of conduct, they failed to object to others.  The court notes, as discussed above in connection with the discussion of the prosecutorial misconduct claim, that Knotts's counsel objected and moved for a mistrial when the prosecutor argued that Knotts had attempted to shoot Helen Rhodes's son.  Because this court concluded, however, that there was not a constitutional violation in connection with the prosecutor's conduct, even when viewed as a whole, including the portions objected to, this court also concludes that there has been no showing of ineffective assistance of counsel.  "If the very things that Petitioner argues his counsel should have objected to, or asked for, do not reach violations of constitutional proportions, then his counsel's failure to object to, or ask for, these things did not prejudice Petitioner."  Jamison v. Collins, 100 F. Supp. 2d 647, 728 (S.D. Ohio 2000), aff'd, 291 F.3d 380 (6th Cir. 2002).  Therefore, the court cannot conclude that the denial of this claim by the state court resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law, or resulted in a decision that was based on an unreasonable determination of the facts in the light of evidence presented in the state court proceedings.

H.  Defense Counsel Failed to Object to Numerous Erroneous Jury Charges

Knotts argues that trial counsel failed to object to numerous erroneous jury charges, such as the felony murder charge, the failure to charge as to unanimity, and the improper amendment of the indictment, thereby rendering ineffective assistance of counsel.

Having concluded, as discussed above in connection with various claims asserted by Knotts challenging the jury charges directly, that there was no constitutional violation arising from the jury charges given by the trial court, this court also concludes that there has been no showing of ineffective assistance of counsel. See Jamison, 100 F. Supp. 2d at 728. Therefore, the court cannot conclude that the denial of this claim by the state court resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law, or resulted in a decision that was based on an unreasonable determination of the facts in the light of evidence presented in the state court proceedings.

Some of the omissions with regard to jury charges identified in connection with this claim, however, were not raised in the habeas petition as separate claims for relief. These include a contention that counsel did not object to the absence of a box for a felony murder verdict, that counsel did not object to the failure to provide a manslaughter charge, that counsel failed to object to the absence of a specific intent charge, that counsel failed to object to the disjoined nature of the charge, and that counsel failed to object that the jury had to find guilty or not guilty for each count in the indictment.

In arguing the prejudice aspect of the Strickland standard, Knotts states that prejudice must be presumed because the State's case was not subject to any meaningful adversarial process and that counsel's failure to secure a proper charge on the law of felony murder, manslaughter, or a box on the verdict sheet for a finding of felony murder, and the failure to secure a specific

intent charge left the jury with no choice but to convict Knotts of intentional murder if they believed he had killed Helen Rhodes. The court has already determined that a definition of murder as felony murder was included in the charge along with a definition of intentional murder, and that the jury was instructed that they could find murder if they did not find that the State had upheld its burden to prove capital murder. The court does not agree with Knotts, therefore, that the jurors were only instructed that they could find Knotts guilty of intentional murder if they believed he killed Helen Rhodes.

As to the additional grounds for this claim, that counsel failed to object to the absence of a manslaughter charge, counsel for Knotts had requested a manslaughter charge, and that charge was rejected by the trial court because the court concluded that there was "no evidence to support manslaughter." Vol. X, Tab 10, page 1292.

In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254. Knotts has failed to meet this burden. In light of the fact that there was insufficient evidence to support a manslaughter charge, Knotts cannot demonstrate prejudice in his attorneys' failure to object to the trial court's decision not to include a manslaughter charge. Accordingly, the court concludes that he is not entitled to relief on this aspect of his claim.

## IV. Judicial Bias

Knotts has argued that many of the errors which he alleges occurred during his trial and sentencing were due to the trial court's bias against him. The State objects to Knotts's request

for a re-trial on that basis, and insists that only the claims that the trial judge was biased during sentencing and the Rule 32 proceedings are properly before the court.  In response, Knotts says that the request for a reversal of the conviction is not substantively different from the judicial bias claim which was properly exhausted.

This court has reviewed the brief submitted by Knotts in support of his direct appeal to the Alabama Court of Criminal Appeals.  The heading of the claim which discusses judicial bias is "The Circuit Court's Override in this Case was Fundamentally Unfair."  Vol XXXIV, Tab 1, page 63. Throughout the four page discussion, Knotts focuses on the court's override of the jury's recommendation of life without possibility of parole.  Although there are references to instances of alleged bias during the trial itself,  these are recounted as part of Knotts's argument that "displays of bias focused on the sentencing phase of the trial. . . ."  Id. at 64.  In the brief, Knotts stated that impartiality is far more important in a case where the judge imposes sentence or otherwise acts as fact finder.  Id. at 65.  At the end of the discussion in his brief to the Alabama Court of Criminal Appeals, Knotts stated that because he "received an override death sentence from a sentencing judge who, there is good reason to believe, was not suitably impartial, he is entitled to a new sentencing hearing before a different judge." Id. at page 66.   In its review of this claim, the Alabama Court of Appeals stated that the "appellant also contends that he is entitled to a new sentencing hearing before a different judge because he believes that the trial judge was 'not suitably impartial.'" Vol. XXXVII, Tab 4, page 30.[4]

---

[4] The only mention of a new trial on the basis of bias of the trial judge of which this court is aware is in the Application for Rehearing of the affirmance of the denial of his Rule 32 petition.  See Vol. LI, Tab 5, page 16.  This claim was not raised on direct appeal, however.

A federal district court must insure that a petitioner's claim has been fairly presented to a state court in a context in which the court has an opportunity to consider and rule upon it. Castille v. Peoples, 489 U.S. 346, 351 (1989). Knotts argues that even though he seeks reversal of his conviction rather than merely a new sentencing hearing, this claim is not substantially different from the judicial bias claim which was properly exhausted in the state court. There was no claim fairly presented to the court on direct appeal that any alleged bias infected the guilt-innocence phase of the trial. This court concludes, therefore, that only a claim for re-sentencing based on judicial bias is properly before it. That claim, of course, has been rendered moot by this court's previously ordered relief and Knotts's subsequent re-sentencing to life imprisonment without a possibility of parole.[5]

### V.  Claim that Knotts's Confession was Extracted in Violation of the Constitution

In his Petition, Knotts asserted both that his confession to police was involuntary under the Fifth and Fourteenth Amendments, and that his questioning by the police was in violation of the Sixth Amendment to the Constitution of the United States and Article I of the Alabama constitution because he had previously invoked a right to counsel in another matter.

---

[5] Knotts also argues that the judge evidenced bias when he reviewed Knotts's Rule 32 petition. The State responds that there is no cognizable constitutional claim for bias during state collateral proceedings. It appears to the court, however, that Knotts offers these arguments and citations to the record as evidence of bias to support a finding that the trial court was biased against Knotts during the trial and sentence. There is no mechanism by which a § 2254 petition can be granted to afford the petitioner a new hearing upon collateral review in state court. The claim that Knotts is entitled to a new sentencing hearing because of the court's bias is, as discussed above, moot because of the relief already granted in this case.

The State responds that any claim of involuntariness based on the circumstances was determined by the Magistrate Judge, and subsequently by this court, to be procedurally defaulted.  See Recommendation at pages 36-39 (stating that paragraph 250 of the Petition is procedurally defaulted).  This court agrees and finds that relief is procedurally barred as to any claim based on the effect of Knotts's condition on the voluntariness of his confession.

 Knotts also contends that because his taped confession was obtained without the presence of counsel in violation of his constitutional rights, the conviction must be reversed. Knotts does not contend that he requested counsel at that time, but argues that where police are aware of prior retention of an attorney, it is a violation of a defendant's Sixth Amendment right to counsel for the police to interrogate him without the presence of his attorney, citing Massiah v. United States, 377 U.S. 201, 206 (1964).  Knotts states that he had appeared before the Juvenile Court of Jefferson County on a delinquency petition charging him with possession of stolen property and was appointed counsel.

It appears that Knotts's claim that the confession should have been suppressed, which is not procedurally defaulted, is asserted as a violation of the Sixth Amendment and the Alabama Constitution.

Knotts presents no basis from which this court can conclude that, assuming a violation, a violation of state law would entitle one to federal habeas corpus relief.  Therefore, to the extent that this claim is based on state law, it is due to be denied.

"The Sixth Amendment right [to counsel] ... is offense specific. It cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced, that is, at or after the initiation of adversary judicial criminal proceedings--whether by way of formal charge,

preliminary hearing, indictment, information, or arraignment." <u>Texas v. Cobb</u>, 532 U.S. 162, 167-168 (2001).  In other words, even if a defendant invoked his Sixth Amendment right to counsel, that right extends only to the charge for which he invoked counsel and does not extend beyond that charge.  <u>United States v. Grimes</u>, 142 F.3d 1342, 1348 (11th Cir. 1998).  Knotts has cited the court to <u>Coughlan v. United States</u>, 391 F.2d 371 (9th Cir. 1968), for the proposition that he was deemed to have asserted right to counsel even if he retained an attorney in connection with another matter.  It is clear from a recitation of undisputed facts within a dissent to the holding of the case, however, that the attorney in <u>Coughlan</u> was "retained or appointed counsel to assist him in that criminal matter." <u>Id.</u> at 372.  Knotts was not represented by counsel as to charges stemming from Helen Rhodes's killing or the other events of that day when he was questioned by authorities.  Accordingly, the court finds that the Court of Appeals' determination is not an unreasonable decision under federal law or the evidence in the record.  <u>See</u> Vol. XXXVII, Tab 10 at 60-61.

## VI. Claim that the State Failed to Disclose Exculpatory Evidence in Violation of <u>Brady v. Maryland</u>

Knotts argues that notes of an investigative interview with his friend Claburn were not turned over to him even though they contained exculpatory information. The Rule 32 court determined that there was no exculpatory evidence in the notes of the investigation of Claburn. <u>See</u> Vol. XLVIII, Tab 3, page 710.  As this is a mixed question of law and fact, however, this court does not presume that finding to be correct.

To demonstrate a <u>Brady</u> violation a petitioner must prove (1) that the evidence was favorable to him because it was exculpatory or impeaching; (2) that the evidence was suppressed

by the State, either willfully or inadvertently; and (3) that the evidence was material and, therefore, that the failure to disclose it was prejudicial. Williamson v. Moore, 221 F.3d 1177, 1183 (11th Cir. 2000), cert. denied, 534 U.S. 903 (2001).

When Claburn was interviewed about the escape from the juvenile facility, he did not mention any incident of being splashed by a car, or any expression of a desire for revenge on Knotts's part. Vol. XLIX, Tab 4, page 55-6. When asked, however, Claburn did state that he and Knotts walked across a yard and that a woman yelled at them to get out of her yard. Id. at page 56. Claburn was not asked whether, and nowhere denied that, a splashing incident took place.

Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Strickler v. Greene, 527 U.S. 263, 280 (1999). "The materiality inquiry is not just a matter of determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusions," but is instead a question of whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Id. at 290.

Knotts contends that the absence of any testimony about the splashing incident or an expression of a desire for revenge on his part calls into question whether he intended to kill Helen Rhodes, and that the notes of Claburn's interview could have shown that the splashing incident never happened.

Knotts does not describe any basis for admissibility of the unsworn notes. The Eleventh Circuit has noted, citing Supreme Court precedent, that transcribed notes of a witness interview

contain a real risk of inaccuracy and untrustworthiness. <u>Williamson</u>, 221 F.3d at 1183. Further, the notes could not have been used as impeachment evidence because Claburn did not testify at trial. Knotts states that the notes cast doubt on Claburn's grand jury testimony, but that would not be evidence considered by the guilt-innocence phase jury at his criminal trial. Further, Knotts would not have been able to rely on impeachment during the grand jury testimony because a defendant in Alabama has no right to be present before the grand jury. <u>See</u> <u>Rheuark v. State</u>, 601 So. 2d 135, 140 (Ala. Crim. App. 1992).

Because the evidence was not admissible, for prejudice to exist the court "must find that the evidence--although itself inadmissible--would have led the defense to some admissible evidence." <u>Williamson</u>, 221 F.3d at 1183. Knotts argues that the notes were critical because if competent counsel had had further reason to investigate Knotts's confession, it would have been clear that the splashing incident never happened. Knotts does not explain, however, why the fact that the splashing incident was not contained in Claburn's statement establishes that the incident did not happen. Knotts further fails to describe any admissible evidence that could have been presented to the jury to counter Knotts's detailed description of the splashing incident. <u>See</u> Vol. XVII, Tab 18, pages 39-40. "A court cannot speculate as to what evidence the defense might have found if the information had been disclosed." <u>Williamson</u>, 221 F.3d at 1183.

Furthermore, as stated above, although Claburn does not discuss the splashing incident in his statement to the police, Claburn does state that he and Knotts walked across a yard and that a woman yelled at them to get out of her yard. Vol. XLIX, Tab 4, page 56. This is consistent with Knotts's testimony in his confession that when he and Claburn escaped from Mt. Meigs, he saw the lady he later shot and she was calling them names. Vol. XVII, Tab 18, page 39. The notes

45

of Claburn's interview corroborate, therefore, that there was a previous run-in with Helen Rhodes, although they do not mention the splashing incident. The notes of the interview with Claburn also establish that Knotts knew where the person with whom they had a run-in lived. Therefore, even if the evidence was suppressed by the State, the court cannot conclude that it was either exculpatory or impeachment evidence, or that the evidence was material. Accordingly, Knotts is not entitled to relief on this claim.

> VIII.[6] The Prosecution Improperly Double Counted One Fact to Satisfy Two Separate Elements of Capital Murder

Knotts argues that the burglary-murder count of the indictment against him was impermissibly duplicative because the same fact, the intent to kill Helen Rhodes, was used to satisfy the mens rea requirement of the murder and burglary prongs of the capital murder charge. Knotts states that Alabama's burglary-murder statute allows for this impermissible double counting. Knotts also argues that the burglary-murder statute violates the Eighth Amendment because it fails to narrow the number of murder-defendants who are eligible for the death penalty. This latter argument was not fairly presented to the State court by Knotts in his direct appeal, however, where the argument advanced was that the "double counting" is impermissibly duplicative. See Vol. XXXIV, Tab 1, at page 103.

The State points out that the indictment charged that Knotts committed the burglary with intent to commit murder, robbery and/or theft of property. The State also points out that the Court of Criminal Appeals, in denying his claims, cited to previous Alabama decisions which

_____

[6] Claim VII concerns the imposition of the death penalty in this case and is therefore moot.

had rejected the arguments raised by Knotts.  See Vol. XXXVII, Tab 4, page 62.  In White v. State, 587 So. 2d 1218, 1228 (Ala. Crim. App. 1990), aff'd sub nom., Ex parte White, 587 So. 2d 1236 (Ala. 1991), the court rejected the argument that the use of burglary as the aggravating component of the capital offense is improper where the only motive for the burglary is the commission of the crime of murder.  In so holding, the court relied on Lowenfield v. Phelps, 484 U.S. 231, 246 (1988), for the proposition that "the fact that the aggravating circumstance duplicated one of the elements of the crime does not make this sentence constitutionally infirm." Id.

The contrary authority which Knotts cites to undermine the Alabama court's application of federal law, Parker v. State, 292 Ark. 421, 426 (1987) and Sellers v. State, 295 Ark. 489 (1989), analyze an Arkansas felony murder statute.[7]  Accordingly, this court cannot conclude in this case that the decision of the Alabama Court of Criminal Appeals resulted in a decision that was contrary to, or involved an unreasonable application of, federal law set forth by Supreme Court cases.

IX.  Claim that the Prosecutor Sought to Paint the Homicide as Part of a White Supremacist Conspiracy

This claim arises from the prosecutor's eliciting testimony regarding gangs and references to gang activity in her closing remarks.  Knotts argues that it is clear under the law that injecting race into a criminal trial threatens to have an incendiary effect on the jury and is a violation of the accused's right to a fair trial.

----

[7] This court also notes that Parker, upon which Sellers relied, has been rejected by at least one other court as being against the great weight of authority.  See Commonwealth v. Claudio, 634 N.E.2d 902, 905 (Mass. 1994).

It is undisputed that Knotts wrote a note containing references to racial gangs and left it on the mantel of Rhodes's home.  According to his statement to the police, he left the note so that the police would think that the killing was gang related.  Vol. XVII, Tab 18, page 68.  While Knotts challenges the admission of the note as evidence, he particularly challenges testimony elicited by the prosecutor from an Officer Loebler who testified about "BASH," which she testified is a white supremacist group trained to kill minorities. Vol. VIII, Tab 10, pages 950-51.  Knotts states that the Alabama Court of Criminal Appeals wrongly decided that any error in allowing the testimony, or the prosecutor's comments on it, was harmless.

The State argues, in response to Knotts's argument, that the note itself was relevant because it was part of the res gestae of the crime, and it bore on the issue of intent, because by writing it and leaving it on the mantel to divert law enforcement from Knotts before he killed her, Knotts evidenced an intent to kill Helen Rhodes.

The trial court instructed the jury at the end of trial that the evidence regarding gangs was not admitted for the truth of the matter, but to show that the defendant left the note to throw off the police, not to show that he was a member of any gang. Vol. XI, Tab 10, pages 1431-32.  The court also specifically instructed the jury to "disregard that testimony as it relates to gang activity or tries to connect the defendant with being a member of a gang." Id. at 1432.

The cases argued by Knotts are factually inapposite.  See, e.g., Turner v. Murray, 476 U.S. 28, 35 (1986) (defendant accused of interracial capital crime is entitled to have prospective jurors informed of the victim's race and questioned on the issue of racial bias).  Knotts himself injected the concept of gangs with his note and the jury was instructed as to the limited purpose for which the evidence was admitted after the prosecutor's comments on that evidence.  This

court concludes, therefore, that the Alabama court's decision is not contrary to or does not involve an unreasonable application of federal law.

X.   Claim Based on Consolidated Seven Indictments

Knotts argues that because seven indictments were consolidated for trial, the jury was allowed to hear evidence about other offenses.  The other charged offenses involved Knotts's escape from the juvenile detention facility and the thefts which occurred before the murder.  The murder weapon was the product of one of these thefts.

In reviewing this claim, the Alabama Court of Criminal Appeals stated that the indictments were properly consolidated pursuant to Alabama Rule of Criminal Procedure 13.3 because the offenses were of the same or similar character, were connected in their commission, and were part of a common scheme or plan.  Vol. XXXVII, Tab 4, page 103.  Knotts contends that the indictments did not involve the same conduct, were not part of a common scheme, and were not otherwise sufficiently connected to permit consolidation.

The Supreme Court authority Knotts cites is Pointer v. United States, 151 U.S. 396 (1894).  He cites that case for the proposition that charges may be separated where the substantial rights of the accused may be prejudiced.

Upon de novo review of the record, it appears to the court that the majority of the facts underlying each of the indicted offenses was outlined in Knotts's statement to the authorities about the events during his flight from Mt. Meigs.  He left Mt. Meigs on the bicycle he was charged with stealing and went to a home which he broke into and from which he stole items including a firearm.  Vol. XVII, Tab 18, page 47.   He stole additional firearms and ammunition

from another home.  Id. at page 50.  He stated that he stole the guns thinking he could use them

to scare someone out of their car.   Id. at 62.  Then he broke into the Rhodes's home and waited

there for Helen Rhodes to return.  He shot Helen Rhodes and stole her car from her home.

Upon a de novo review of the record, this court concludes that the Alabama Court of

Criminal Appeals' determination that the charged offenses could be consolidated because they

involved the same conduct, were part of a common scheme, and were sufficiently connected to

permit consolidation was not contrary to or did not involve an unreasonable application of

federal law set forth by Supreme Court cases, nor was it based on an unreasonable determination

of the facts in light of the evidence presented in the State court proceeding.

### XI. Claim that Trial Court Refused to Change Venue

It is undisputed that there was pre-trial publicity about Knotts's case.   A defendant is

entitled to a change of venue if he can demonstrate either "actual prejudice" or "presumed

prejudice."  Meeks v. Moore, 216 F.3d 951, 961 (11th Cir. 2000), cert. denied, 531 U.S. 1159

(2001).  Actual prejudice exists where one or more jurors who decided the case entertained an

opinion, before hearing the evidence adduced at trial, that the defendant was guilty, and it is

determined that these jurors could not have laid aside these preformed opinions and rendered a

verdict based on the evidence presented in court. Id. (citing Coleman v. Zant, 708 F.2d 541, 544

(11th Cir.1983)).  If a defendant cannot show actual prejudice, then he must meet the presumed

prejudice standard.  Id. Prejudice is "presumed from pretrial publicity when pretrial publicity is

sufficiently prejudicial and inflammatory and the prejudicial pretrial publicity saturated the

community where the trials were held." Id.  Presumed prejudice "is rarely applicable, and is

reserved for an extreme situation" where there is evidence of "inflammatory, prejudicial pretrial

publicity that so pervades or saturates the community as to render virtually impossible a fair trial by an impartial jury drawn from the community . . . ." Id.

Knotts does not argue that there was actual prejudice, but argues that the trial court's refusal to change venue was improper where an informal telephone survey of 100 Montgomery County residents prior to trial revealed that 79 % of those polled were familiar with the crime and 28% of those polled believed Knotts to be guilty.  Although the results of this poll were merely proffered at the trial of the case and not admitted, the Alabama Court of Criminal Appeals considered the results of this poll.  The Alabama Court of Criminal Appeals pointed out that the pollster did not have an opinion as to the accuracy of the poll.  Vol. XXXVII, Tab 4, page 98 n.1.  The Alabama Court of Criminal Appeals also considered the responses of the venire persons during voir dire in determining that there was no prejudice.  This court cannot conclude that the determination by the Alabama Court of Criminal Appeals that Knotts failed to demonstrate that the media coverage was prejudicial resulted in a decision that was contrary to or involved an unreasonable application of federal law set forth by Supreme Court cases or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

### XII.  Claim that Case Was Improperly Transferred from Juvenile Court

As stated earlier, Knotts was originally charged with burglary murder in a delinquency petition filed in the juvenile court, which was transferred to circuit court.  He was later indicted and tried for robbery murder as well.  Knotts argues that the trial court lacked jurisdiction to indict and try him for an offense which was never charged in any delinquency petition.  Knotts cites to no federal law allegedly violated by these facts.

In denying Knotts's claim, the Alabama Court of Criminal Appeals cited to previously-decided cases in which it was determined that a defendant could be indicted in circuit court for an offense different from one charged in his delinquency petition as long as it is based on behavior arising out of the same transaction. See Vol. XXXVII, Tab 4, page 7 (citing Tolbert v. State, 598 So. 2d 1011 (Ala. Cr. App. 1991)).  Because Knotts has cited no federal law to the contrary, this court cannot conclude that the determination by the Alabama Court of Criminal Appeals resulted in a decision that was contrary to or involved an unreasonable application of federal law set forth by the Supreme Court.

XIV.[8]  Claim that Judge Diluted the State's Burden of Proof

According to Knotts, the trial judge gave a long and confusing statement that failed to coherently define the legal standard of reasonable doubt.  Knotts argues that the effect of this instruction was to impermissibly dilute the State's burden of proof.  In support of this argument Knotts cites Cage v. Louisiana, 498 U.S. 39 (1990).  In that case, the jury was charged that to find a reasonable doubt there had to be an "actual substantial doubt" and "grave uncertainty."  Id. at 40.  The Supreme Court concluded reasonable jurors could have understood the charge as a whole to require a higher degree of doubt than what is required.  Id. The Supreme Court later clarified that the standard of review used in Cage was inappropriate, and that in reviewing an ambiguous instruction the court should inquire "whether there is a reasonable likelihood that the

---

[8] The claim numbered XIII is a claim that the trial judge considered information that the petitioner had no chance to rebut.  This claim was based on an argument that Knotts was not allowed to rebut evidence that the trial court relied upon in overriding the jury's recommendation of life without possibility of parole and sentencing Knotts to death.  In light of this court having already granted habeas corpus relief on Knotts's penalty phase claims, this claim is moot.

jury has applied the challenged instruction in a way" that violates the Constitution. <u>Estelle v.</u>
<u>McGuire</u>, 502 U.S. 62, 72 (1991).

Assuming that the charge analyzed in <u>Cage</u> would be unconstitutional under the
appropriate standard, <u>see</u> <u>Cockerham v. Cain</u>, 283 F.3d 657, 663 (5th Cir. 2002),
this case is distinguishable from <u>Cage</u>.  In this case, the jury was charged, in part, as follows:

> The law says a doubt which would justify an acquittal, that is not guilty, must be
> an actual and substantial doubt, not just a mere possible doubt– strike that. The
> law says a doubt which would justify an acquittal must be an actual doubt, not
> just a mere possible doubt.  A reasonable doubt is not a mere guess or surmise and
> it is not a capricious doubt.  If after considering all of the evidence in the case you
> have an abiding conviction of the truth of the charge, the charge in all of the cases
> or the charge in one case or two cases, three cases, et cetera, then you're
> convinced beyond a reasonable doubt and it would be your duty to convict the
> defendant in any case or all cases that you are convinced beyond a reasonable
> doubt and to a moral certainty that he's guilty.  On the other hand, if after
> considering all the evidence in the cases you do not have an abiding conviction of
> the truth of the charge or charges, then you're not convinced beyond a reasonable
> doubt . . . .

> * * *

> Also, the reasonable doubt which entitles an accused to an acquittal is not a mere
> fanciful, vague, conjectural or speculative doubt, but a reasonable doubt arising
> from the evidence and remaining after a careful consideration of the testimony
> such as reasonable, fair minded, conscientious men and women would entertain
> under all the circumstances.

> * * *

> Beyond a reasonable doubt means beyond a doubt for which a reason may be
> given.

> * * *

> Then you, figuratively speaking, set the evidence out there before you and say is
> the defendant guilty on all or any charges?  And if what springs naturally back
> from your conscience and mind is that I have no doubt that he is, based on the
> evidence, then you have been convinced beyond a reasonable doubt and it would
> be your duty to convict the defendant.  On the other hand you do the same with
> the evidence and if what springs naturally back from your conscience and mind is
> that I have doubt that he is based on a lack of evidence or the evidence on all or
> any or the charges, then it would be your duty to acquit the defendant on all or

any charge that you find the state has not proved him guilty beyond a reasonable
doubt and to a moral certainty.

Vol. XI, Tab 10, pages 1437-40.

While the trial court's charges on the definition of reasonable doubt initially did contain the term "actual substantial doubt," the court followed the use of that term with "strike that" and repeated the sentence without the use of that term.  The Alabama Court of Criminal Appeals, however, did not reach the question of the efficacy of the trial judge's directive to "strike that." Vol. XXXVII, Tab 4, page 51.  A reference to "substantial doubt" is not sufficient to render a charge unconstitutional, however, if the context makes clear that the word "substantial" is used "in the sense of existence rather than magnitude of the doubt," as it was here, having been used within the context of an overall charge which referred to the evidence in the case.  See Victor v. Nebraska, 511 U.S. 1, 20 (1994).  The reasonable doubt charge given the jurors in the instant case, though long, was not otherwise substantially similar to the impermissible charge in Cage. Although the Supreme Court has stated that it does not condone the use of the phrase "moral certainty," if the instruction gives meaning to the phrase by referring to the evidence in the case, the phrase is permissible.  Id. at 16.  The charges in this case as a whole did that.  The Supreme Court has also noted that charging jurors that "they must have an abiding conviction of the defendant's guilt does much to alleviate any concerns that the phrase 'moral certainty' might be misunderstood in the abstract."  Id.  at 21.  The Supreme Court has also stated that there is nothing impermissible about a reference to "not a mere possible doubt."  Id. at 17.  Therefore, Knotts is not entitled to relief on this claim.

## IV.  CONCLUSION

54

For the reasons discussed, the court concludes that the Petitioner's remaining guilt phase claims are due to be and are hereby ORDERED DENIED. A separate Judgment will be entered in accordance with this Memorandum Opinion and Order.

Done this 28th day of October, 2005.


/s/ W. Harold Albritton
W. HAROLD ALBRITTON
SENIOR UNITED STATES DISTRICT JUDGE